**State of CALIFORNIA, on behalf of the CALIFORNIA DEPARTMENT OF TOXIC SERVICES, Plaintiff,**

v.

**NEVILLE CHEMICAL COMPANY, a corporation; and DOES 1–10, Defendants.**

No. CIV.00–10205 CAS(Ex).

United States District Court,
C.D. California,
Western Division.

May 10, 2002.

See also 213 F.Supp.2d 1115 and 213 F.Supp.2d 1142.

Bill Lockyer, Attorney General, Theodora Berger, Senior Assistant Attorney General, Donald Robinson, Supervising Deputy Attorney General, Laurie Pearlman, Deputy Attorney General, Harrison Pollak, Deputy Attorney General, Office of Attorney General of California, Los Angeles, CA, for Plaintiff.

Thomas H. Clarke, Jr., Dennis J. Byrne, Ropers, Majeski, Kohn & Bentley, LLP, San Francisco, CA, for Defendant.

ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

SNYDER, District Judge.

## I. INTRODUCTION

This case is a cost-recovery action brought by plaintiff State of California on behalf of the Department of Toxic Substances Control ("DTSC")[1] under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.* DTSC seeks to recover costs associated with the cleanup of hazardous substances at a chemical manufacturing plant owned and operated by defendant Neville Chemical Company ("Neville"). In an Order dated March 26, 2002, the Court granted in part plaintiff's motion for summary judgment that Neville was liable for all recovery costs not inconsistent with the National Consistency Plan ("NCP"), but permitted supplemental discovery and briefing on the issue of whether DTSC's recovery costs were inconsistent with the NCP. Order Granting in Part Plaintiff's Motion For Summary Judgment ("March 26, 2002 Order") at 16, 25.[2] Both parties submitted supplemental briefing, and the Court heard oral argument at an April 29, 2002 status conference.

## II. LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the moving party has sustained its burden, the nonmoving party must then identify specific facts, drawn from materials on file, that demonstrate that there is a dispute as to material facts on the elements that the moving party has contest-

---

1. The Court will refer to plaintiff as DTSC.

2. The factual background to this case is set forth in the March 26, 2002 Order.

ed. *See* Fed.R.Civ.P. 56(c). The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). *See also Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. *See also Abromson v. American Pacific Corp.*, 114 F.3d 898, 902 (9th Cir.1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631 & n. 3 (9th Cir.1987). When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted); *Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co.*, 121 F.3d 1332, 1335 (9th Cir.1997). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. *See Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

### III. DISCUSSION

 CERCLA holds responsible parties liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe *not inconsistent with the national contingency plan.*" 42. U.S.C. § 9607(a)(4)(A) (emphasis added). Under CERCLA, a party may recover costs related to actions necessary to effectuate cleanup or removal from the environment of released hazardous substances, actions taken in the event of the threat of release of hazardous substances, actions to monitor, assess and evaluate the release or threatened release of hazardous substances, the disposal of removed material, and actions consistent with a permanent remedy. 42 U.S.C. § 9601(23)-(24). Response costs recoverable under CERCLA include oversight costs incurred by a government agency in an effort to ensure that a site is being adequately investigated and remediated by responsible parties. *State of California v. Celtor Chemical Corp.*, 901 F.Supp. 1481, 1489–90 (N.D.Cal.1995); *State of California v. SnyderGeneral Corp.*, 876 F.Supp. 222, 224–25 (E.D.Cal. 1994). Recoverable response costs also include reasonable attorneys' fees for bringing cost-recovery litigation, as well as indirect costs, or overhead. *Chapman*, 146 F.3d at 1175 (attorneys' fees); *United States v. R.W. Meyer*, 889 F.2d 1497, 1503 (6th Cir.1989) (indirect costs). DTSC contends that its employees have spent thousands of hours since 1985 responding to the releases of hazardous substances at the Neville site. DTSC also contends that attorneys in the California Attorney General's Office have spent more than one thousand hours litigating the present case. Declaration of Laurie Pearlman In Support of Plaintiff's Motion For Summary Judgment ("Pearlman Decl.") ¶ 7, Declaration of Harrison Pollak In Support of Plaintiff's Motion For Summary Judgment ("Pollak Decl.") ¶ 5. Neville concedes "that DTSC has incurred costs in overseeing the investigation and remediation of environmental contamination associated with the Neville site." Pearlman Decl., Ex. A at 30:3–4, but argues that DTSC is not entitled to recover those costs because they are inconsistent with the NCP.

A. Inconsistency with the NCP

■ Response actions undertaken by a federal or state governmental entity, or an Indian tribe, are presumed to be consistent with the NCP. *Washington State Dept. of Transportation v. Washington Natural Gas Co., ("WSDOT")*, 59 F.3d 793, 799–800 (9th Cir.1995). Thus, when a governmental body such as DTSC seeks to recover its costs, it is the defendant's burden to prove that a particular government action is inconsistent with the NCP in order to preclude the government from recovering the costs of taking that action. *Id.* at 800. In order to meet this burden of proof, the defendant must show that the government's particular action was arbitrary and capricious. *Id.* at 803; 42 U.S.C. § 9613(j)(2).

In opposition to DTSC's motion for summary judgment, Neville argues that DTSC's actions are inconsistent with the NCP because: (1) DTSC acted in an arbitrary and capricious manner when it allegedly represented that it would not seek cost recovery against Neville, but later did so; and (2) DTSC has offered insufficient documentary evidence to support the recovery of some of its claimed costs. In its March 26, 2002 Order, the Court held that Neville had not raised a material question of fact to support its first argument. Therefore, the only question remaining is whether there is a material question of fact that DTSC's alleged failure to document its claimed costs properly was arbitrary and capricious.

The NCP provides that:

During all phases of response, the lead agency shall complete and maintain documentation to support all actions taken under the NCP and to for the basis for cost recovery. In general, documentation shall be sufficient to provide ... accurate accounting of federal, state, or private party costs incurred for response actions ...

40 C.F.R. § 300.160(a)(1). The regulation does not further define "accurate accounting" or elaborate on what is meant by "sufficient." *United States v. Chrysler Corp.*, 168 F.Supp.2d 754, 769 (N.D.Ohio 2001). Neville argues that DTSC's documentation is not sufficient to provide for accurate accounting, and is thus arbitrary and capricious, in the following respects: (1) DTSC's documentation of employee labor costs does not provide a specific description of the duties of particular employees who worked at the Neville site; (2) DTSC's documentation of travel expenses fails to explain what necessitated the travel; (3) three invoices issued by DTSC contain discrepancies; (4) DTSC failed to explain fluctuations in the calculation of indirect cost ratios between 1989 and 1995; and (5) DTSC failed to explain why some direct labor costs were funded using bond funds, while others were not. The Court will consider each of these arguments below.

1. Employee Labor Costs

■ Neville argues that DTSC's employee labor costs are inconsistent with the NCP because the timesheets prepared by DTSC employees:

"fail to provide an adequately detailed explanation of the actual services performed by the employees [because] [p]roject activity codes ('PCA') used to designate DTSC site related functions are too general to allow one to determine what specific employee activity a given [Summary By Activity ('SBA')] entry documents. Without more specific information regarding the actual work performed by an employee, the labor charges cannot be verified as to their reasonableness, necessity and/or association with environmental activities associated with the Neville property."

Declaration of Peter Johnson in Support of Defendant's Supplemental Brief in Opp'n

to Plaintiff's Motion For Summary Judgment ("Johnson Suppl. Decl.") ¶ 3.[3] DTSC has provided Neville with employee time sheets documenting all the time which DTSC employees allegedly spent on the Neville project dating back to 1985. According to a declaration filed by Jeffrey Mahan, who served as DTSC's Chief of Audits Unit from 1989 to 1997 and is currently DTSC's Special Assistant for Cost Recovery and Reimbursement Policy, DTSC's time sheets are attested to by the employee and then reviewed and certified by the employee's direct supervisor. Declaration of Jeffrey Mahan in Support of Plaintiff's Motion For Summary Judgment ("Mahan Decl.") ¶¶ 2, 3, 11. The time sheets require that every hour worked by a DTSC employee be allocated to an activity code, or PCA, and a site code. *Id.* ¶ 9. The PCAs correlate to relatively broad activity categories, such as "Remedial Investigations/Feasibility Study," "Removal Actions," "Public Participation Plan Development and Implementation," and "Cost Recovery." DTSC periodically issues a coding manual, available to the public, that provides information about what specific activities fall into each PCA category. The site codes correlate to specific DTSC projects. The thrust of Neville's argument is that DTSC's time sheets do not provide a specific description of exactly what task an employee was engaged in at a particular time on the Neville site. However, Neville has not cited any case where a specific description of exactly what task the employee performed at a particular time was held to be required by 40 C.F.R. § 300.160(a)(1). Several courts, including

the Ninth Circuit, have accepted documentation such as that presented by DTSC as adequate for the purposes of 40 C.F.R. § 300.160(a)(1). *See Chapman*, 146 F.3d at 1171 (government agency's documentation of costs was consistent with the NCP where the agency "kept extensive records of recovery costs in the form of timesheets, cost estimates, and accountant and attorney declarations"); *United States v. Chromalloy American Corporation*, 158 F.3d 345, 352 (5th Cir.1998) (government agencies documentation of costs was sufficient where it submitted "detailed cost summaries of its oversight expenses"); *Chrysler Corp.*, 168 F.Supp.2d at 769 (contractor's invoices, which broke down expenses into eight general categories such as labor, travel and subsistence, were sufficiently specific standing alone to meet the requirements of 40 C.F.R. § 300.160(a)(1), in spite of contractor's failure to provide "project daily summaries, project daily details, reimbursable travel and subsistence logs, contractor personnel reports, equipment usage logs, and subcontractor reports....").[4] In the instant case, the time sheets provided by DTSC show in detail how much time individual employees spent at the Neville site, as well as their billing rate and the general category of activity in which they were engaged. Furthermore, Neville has submitted no evidence suggesting that DTSC's decision not to document precisely what activity employees were engaged in at the Neville site at any particular time led to any accounting problems during the Neville site cleanup.[5] Accordingly, the Court finds that the time sheets utilized by DTSC provide sufficient docu-

---

**3.** DTSC objects to the Johnson declaration on the grounds that he is not qualified as an expert. Johnson declares that he has been engaged in the environmental engineering and cost analysis field since 1981. Johnson Suppl. Decl. ¶ 1. The Court finds that Johnson is sufficiently qualified by knowledge, skill, experience, training or education to testify as an expert pursuant to Fed.R.Evid. 701.

**4.** The *Chrysler Corp.*, court held that summary judgment was inappropriate on some of the contractor's expenses, due to mistakes and inconsistencies in the invoices themselves. *Chrysler Corp.*, 168 F.Supp.2d at 769–70.

**5.** The activities necessary to effectuate the Neville site cleanup are described in detail in several documents, most notably the Remedial Action Order and Final Remedial Action

mentation to permit accurate accounting, and DTSC's procedures for accounting for employee labor costs are not arbitrary and capricious, because the time sheets clearly allocate costs by site and by category of activity.

### 2. Travel Expenses

■ Neville argues that DTSC's documentation of site-related travel is inadequate, because "no specific information is provided [on travel expense reports] as to what site related activities necessitated the particular travel expense." Johnson Suppl. Decl. ¶ 4. According to Neville, this may result in its being charged for travel expenses unrelated to the Neville site. As evidence that this has in fact occurred, Neville offers a memo dated April 14, 2000, documenting an attorney's trip from Sacramento to Glendale to meet with DTSC staff. Declaration of Dennis Byrne in Support of Neville's Supplemental Brief in Opp'n to Motion for Summ. Judg., Ex. D. The memo states that the purpose of the trip was to "meet with staff" regarding "Neville," "El Toro," "El Centro," "Angeles," and "Western Lead Products." *Id.* The full cost of the trip was apparently charged to Neville. Neville argues that the memorandum demonstrates the shortcomings of DTSC's accounting for travel, as well as documenting costs which were improperly allocated to it.

DTSC responds that regardless of which projects were discussed at the Glendale office, there is no evidence that the disputed travel was occasioned by anything other than the Neville discussion. DTSC also offers the declaration of its expert, Jeffrey Mahan, that when travel is occasioned by more than one site, DTSC allocates the costs among the different sites. Declaration of Jeffrey Mahan in Support of DTSC's Supplemental Brief in Support of Motion for Summ. Judg. ("Mahan Suppl. Decl.") ¶ 6. The Court finds that a single alleged misallocation of travel expenses is not sufficient to create a material question of fact that DTSC's accounting practices with regard to travel expenses were so inadequate as to be arbitrary and capricious.[6]

### 3. Invoices

■ Neville argues that DTSC's charges between 1985 and 1996 are suspect because of "discrepancies . . . in different invoices DTSC issued for work performed during a given time period." Johnson Suppl. Decl. ¶ 5. In particular, Neville argues that invoice No. 12687, dated March 17, 1994, invoice No. 13058, dated August 23, 1996, and a Summary By Activity ("SBA") dated April 17, 1997, reflect different amounts for the same period of time. DTSC argues that the discrepancy in the amounts shown by the three documents is due to revisions in its calculation of indirect cost rates, and that the later dated invoices explicitly state that they supersede the earlier dated invoices. DTSC submits a letter, sent to Neville in conjunction with invoice No. 13058, which explains that the new invoice reflects revised indirect cost rates for the fiscal periods July 1987 through June 1996, and which explicitly instructs Neville to disregard invoice No. 12687 "since it has been superseded by enclosed invoice No. 13058." Mahan Decl., Ex. B at 56. Similarly, when DTSC provided the April 17, 1997 SBA to Neville, it enclosed a letter explaining that there had been adjustments "which modify

---

Plan. *See* Declaration of Harlan Jeche in Support of Plaintiff's Motion For Summary Judgment, Exs. A and B. Neville has not alleged that the cleanup was not performed, or that DTSC failed to oversee the cleanup.

6. However, DTSC is instructed to properly allocate the travel expenses with regard to the trip described in the April 14, 2000 memorandum.

the previous SBA sent to you on August 26, 1996."[7] Mahan Suppl. Decl. ¶ 10, Ex. G. The April 17, 1997 SBA itself states that it "supersedes any previously issued SBA for the time periods noted." *Id.* The Court finds that Neville has not demonstrated a material question of fact that the discrepancies it points to in the invoices demonstrate that DTSC is improperly accounting for its costs.

### 4. Indirect Costs

■ Neville argues that DTSC has not adequately explained significant fluctuations in the indirect cost ratios ("ICRs") used to calculate the indirect costs charged to Neville. Neville's expert Johnson states that:

> It appears the indirect cost pool used in calculating the ICR ha[s] nearly doubled during the years 1989 through 1995. This ICR cost-pool inflation increased DTSC's overhead costs, which were used to calculate the ICR. DTSC provided no documentation to account for the significant fluctuations noted in ICR used to calculate the indirect costs charged to Neville.

Johnson Suppl. Decl. ¶ 6. DTSC responds that the NCP does not require it to speculate as to why the indirect cost pool has increased, but merely to document its methodology for calculating the ICR. DTSC calculates ICRs by dividing DTSC's indirect costs (i.e. overhead) by its total direct labor costs. ICRs are derived in accordance with "Indirect Cost Rate Proposals" prepared by DTSC which set forth the data, formulas, and calculations used to arrive at every ICR. Mahan Suppl. Decl. ¶ 7, Ex. E (example of an ICRP). DTSC's

methodology is in turn based on federal guidelines. *See id.* Ex. E (stating that the ICRP is prepared "in accordance with the requirements of the State and Federal OMB Circular A–87, 'Principles for State and Local Governments'"). The Court finds that Neville has not provided any evidence to support its claim that DTSC's indirect cost rates are not properly documented. *Cf. Chrysler Corp.*, 168 F.Supp.2d at 770 (conditioning government's recovery of indirect costs on its ability to produce "any formula supporting the calculation of indirect costs").

### 5. Bond Expenditures

■ Neville challenges two aspects of DTSC's costs related to its use of bond funds to pay for part of the Neville cleanup.[8] First, Neville argues that DTSC did not sufficiently explain why some direct labor costs were funded using bond funds while others were not. However, Neville provides no authority for its argument that DTSC must explain its decision to fund particular aspects of cleanup projects from bond funds as opposed to non-bond funds. DTSC has provided ample documentation of its use of bond funds, and of its methodology for calculating bond interest, and the Court finds this sufficient to meet the requirements of 40 C.F.R. § 300.160(a)(1). Second, Neville argues that there are discrepancies in different DTSC documents showing the bond principal amount, from which bond interest is calculated. However, even according to Neville's calculations, these discrepancies are in the nominal amounts of $2.94 and $133.39. Johnson Suppl. Decl. ¶ 8. DTSC states that these discrepancies appear to be due to data-

---

7. These adjustments consisted mainly of revisions to the rate for calculating indirect costs.

8. DTSC has the option of funding part of its site mitigation costs through bonds issued by the State Treasurer's Office. Because interest on the bond funds must be paid to holders of

the bonds, state law directs DTSC to recover this expense as a response cost. *See* Cal. Health & Safety § 25360.1. Accordingly, DTSC charges responsible parties for the bond interest on that portion of a site cleanup for which bond funds are utilized.

entry errors, and that the most recent SBA, which forms the basis for DTSC's present cost recovery claim, shows the correct amount. Mahan Supp. Decl. ¶ 12. The Court finds that these minor discrepancies, which appear to have been corrected, do not create a material question of fact as to the propriety of DTSC's accounting practices.

In sum, the Court finds that there is no material question of fact as to the proper documentation of DTSC's costs.

### B. DTSC's Request For Interest and Attorneys' Fees

In its March 26, 2002 Order, the Court held that DTSC was entitled recover all properly documented cleanup costs, as well as interest on those costs, but did not grant summary judgment because there were outstanding issues concerning documentation of costs. Based on the conclusion set forth herein, the Court finds that Neville is entitled to interest on those costs and its reasonable attorneys' fees. *See Chapman*, 146 F.3d at 1175 (recoverable response costs include reasonable attorneys' fees for bringing cost-recovery litigation).

## IV. CONCLUSION

For the reasons discussed above, plaintiff's motion for summary judgment is GRANTED as to defendant's liability for all disputed recovery costs. Plaintiff is also entitled to recover interest and reasonable attorneys' fees. The Court hereby orders plaintiff to prepare and file a form of judgment, consistent with this order, setting forth the exact amount of its recovery costs, and substantiating its claim for interest and attorneys' fees.

IT IS SO ORDERED.